# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CEDAR RAPIDS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>RUSSELL HEBERT, JR.,<br><br>    Defendant. | No. CR05-0072<br><br>**REPORT AND RECOMMENDATION** |

_____

This matter comes before the court pursuant to Defendant Russell Hebert, Jr.'s October 10, 2005 motion to suppress evidence (docket number 14). The court held an evidentiary hearing on this motion on October 24, 2005, at which the defendant was present and represented by John Bishop and the government was represented by Assistant United States Attorney C.J. Williams. It is recommended that the motion to suppress be denied.

The motion to suppress arises out of statements made by the defendant to several police officers before and during the execution of a search warrant at the defendant's residence. The defendant seeks suppression of statements that he made during his conversation with members of law enforcement, asserting that the statements were made while he was in custody and without the benefit of Miranda warnings. The government argues that the defendant offered his statements voluntarily and that the defendant was not in custody for purposes of Miranda.

## Findings of Fact

On July 14, 2005, Special Agent Richard Lamere (Special Agent Lamere), with the Drug Enforcement Administration, and Linn County Sheriff Sgt. Mark Strait (Sgt. Strait), traveled to Ely, Iowa to execute a search warrant at the defendant's residence. As Special

Agent Lamere and Sgt. Strait approached the defendant's house, they noticed two men standing outside in the backyard. Because of the impending execution of the search warrant, Special Agent Lamere decided that he should approach the two men in the backyard to find out who they were, whether they were associated with the residence, and if they were associated with the residence, to explain what was about to happen. Special Agent Lamere approached the two men and introduced himself, and did not display his gun. He was not in uniform and was carrying a concealed service pistol. He asked the two men who they were, how old they were, and who was in the residence. One man identified himself as the defendant, Russell Hebert, Jr., and the other man gave his name and indicated that he was a juvenile. Special Agent Lamere told the juvenile to go home, and the juvenile left.

Special Agent Lamere, Sgt. Strait, and the defendant sat down at a picnic table in the defendant's backyard. Special Agent Lamere told the defendant that he wanted to explain to him what was going to happen at his house during the execution of the search warrant. Special Agent Lamere told the defendant that he was free to leave, but later asked that he stay so that someone would be there to take custody of the house following the search warrant. Special Agent Lamere asked the defendant for his "assistance," requested that the defendant "behave himself," and told the defendant that his cooperation would be appreciated. Special Agent Lamere told the defendant that he would be treated with respect and that no harm would come to him. Special Agent Lamere and Sgt. Strait did not plan to arrest the defendant unless they uncovered something much more serious than what they already expected to find while executing the search warrant.

Special Agent Lamere asked the defendant if the searching officers would find any weapons in the home. The defendant replied that there were two shotguns in the home. Special Agent Lamere mentioned to the defendant that the search warrant was a drug warrant. The defendant then indicated that marijuana would be found at the top of the stairs in the residence. The defendant was very cooperative.

While the defendant was seated at the picnic table with Special Agent Lamere and Sgt. Strait, the search team began to arrive. The search team entered the defendant's residence through side, back and front entrances. There were approximately six officers in the search team, not including Special Agent Lamere and Sgt. Strait. The search team members were dressed in raid jackets and were not carrying long guns. Several members of the search team walked past the picnic table throughout the course of the defendant's interview, going to and from the house and garage.

Special Agent Lamere described the defendant's demeanor as that of an average, low-keyed young man. The defendant did not appear to Special Agent Lamere or Sgt. Strait to be panicked or nervous. There was no indication that the defendant was intimidated, confused, or overwhelmed. He was not hand-cuffed or physically restrained in any way. At some point, Special Agent Lamere left the picnic table and Sgt. Strait and Deputy Brennan continued questioning the defendant. The defendant did not ask for an attorney or ask if he could leave at any time. Once the search team was finished searching the defendant's residence, the defendant walked through the home with Special Agent Lamere to ensure that the home and its contents had not been harmed during the search warrant execution. At the conclusion of the defendant's interview and the search of his residence, he was not arrested. The interview and search of the defendant's residence took approximately two hours. The defendant was not Mirandized before, during, or after the interview on July 14, 2005. The defendant was 22 years of age at the time of the interview and has a history that includes several arrests.

## Conclusions of Law

The defendant contends that his statements should be suppressed because he was in custody and did not receive <u>Miranda</u> warnings. The government argues that the defendant was not in custody for purposes of <u>Miranda</u> when he was interviewed at the picnic table, and accordingly, the statements made by the defendant should not be suppressed. The

3

parties agree that no Miranda warnings were given to the defendant before, during, or after the interview.

> The holding of Miranda v. Arizona states, in relevant part, as follows:
>
>> the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards, [the Miranda warnings], effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.

Miranda v. Arizona, 384 U.S. 436, 444 (1966).

The court finds that the defendant was not in custody during the interview. The holding of Miranda dictates that a person who is "taken into custody or otherwise deprived of his freedom of action in any significant way" must be warned that he has the right to remain silent, that any statement he makes may be used as evidence against him, and that he has the right to the presence of an attorney, either retained or appointed, before law enforcement may begin questioning. United States v. Martin, 369 F.3d 1046, 1056 (8th Cir. 2004) (citing Miranda v. Arizona, 384 U.S. 436, 444 (1966)). "The ultimate question in determining whether a person is 'in custody' for purposes of Miranda is 'whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" United States v. Czichray, 378 F.3d 822, 826 (8th Cir. 2004) (citing California v. Beheler, 463 U.S. 1121, 1125 (1983)). "The 'only relevant inquiry' in considering that question is how a reasonable person in [the defendant's] position would have understood his situation." Czichray, 378 F.3d at 826 (citing Berkemer v. McCarty, 468 U.S. 420, 442 (1984); Yarborough v. Alvarado, 541 U.S. 652, --- (2004)).

In determining whether the defendant was "in custody" for purposes of Miranda, the court makes a two-part inquiry. First, the court examines the circumstances surrounding the interrogation. Second, the court determines, given those circumstances,

whether a reasonable person would have felt that he or she was not at liberty to terminate the interrogation and leave. Martin, 369 F.3d at 1056 (citing United States v. LeBrun, 363 F.3d 715, 720 (8th Cir. 2004); quoting Thompson v. Keohane, 516 U.S. 99 (1995)). "The initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." Id. at 1056-57 (citing Stansbury v. California, 511 U.S. 318, 323 (1994)). The Eighth Circuit Court of Appeals has commonly used six non-exhaustive indicia of custody in assessing whether an interrogation is custodial. Id. at 1057. The six indicia are as follows:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; (6) whether the suspect was placed under arrest at the termination of questioning.

Id. (citing United States v. Griffin, 922 F.2d 1343, 1349 (8th Cir. 1990).

Here, these indicia support a finding that the defendant was not in custody. First, the interview took place at the defendant's residence, in his backyard, while the defendant was seated at his picnic table. Such a setting is not one in which a reasonable person would traditionally feel restrained.[1] Second, the defendant was specifically informed that

---

[1] See eg. United States v. Wolk, 337 F.3d 997 (8th Cir. 2003) (Defendant was questioned in his home and was told that he was free to leave); United States v. Jones, 630 F.2d 613 (8th Cir. 1980) (In considering the relevant factors for determining whether the defendant was in custody, the court noted "[Defendant] was in her own home and under no physical restraint. She was free to depart . . ."); United States v. Martin, 369 F.3d (continued…)

he was free to leave.[2] Third, the only evidence presented indicates that the defendant enjoyed unrestrained movement throughout the entire course of the interview. He was not told that he could not leave the premises. Although he was asked to stay, it was made clear to him that the reason for this request was to enable the property to be delivered back to a responsible caretaker following the search. Fourth, the evidence presented demonstrates that the defendant voluntarily acquiesced to the officers' requests to respond to questions and offered a significant amount of information. Further, there has been no evidence presented that would indicate that strong arm tactics or deception were used during the course of the defendant's interview. Quite to the contrary, this was a very low-key event as drug search warrants go.

The fact that there were several officers coming and going and passing by the defendant during the course of the interview, in their efforts to execute the search warrant, does not establish that the atmosphere in which the defendant was questioned was police dominated.[3] Finally, the defendant was not placed under arrest at the conclusion of the interview and it was clear that the police never had any such intent.[4] Considering the

---

[1](…continued)
1046 (8th Cir. 2004) (District court's holding that the defendant was not in custody for purposes of Miranda upheld. Two of the challenged interviews took place in the defendant's home.)

[2] The court notes that Special Agent Lamere told the defendant he could leave but asked him to stay so that he could explain what was happening with the search warrant of his residence and so that the defendant could take custody of the home once the search was completed. The court does not agree with the defendant, however, that Special Agent Lamere's statement in this regard amounted to a deceptive practice used to keep the defendant from leaving.

[3] See United States v. Axsom, 289 F.3d 496 (8th Cir. 2002) (Court found that the defendant was not "in custody" for purposes of Miranda, during interrogation in defendant's home even though nine officers were conducting a search of his residence.)

[4] See e.g. Axsom, 289 F.3d 496.

6

totality of the circumstances surrounding the interview, the court finds that a reasonable person would not have believed himself to be in custody. The court further notes that evidence was presented that the defendant has had previous interaction with law enforcement and that this was not the first time that he had been detained or questioned by law enforcement officials.[5]

Finally, the court rejects the defendant's argument that Special Agent Lamere's statement, that no harm would come to the defendant, could have been misconstrued by the defendant as a promise of leniency. The court finds that when considered in context, the comment meant that the defendant would not be physically harmed and that his house would not be harmed in the course of the search. Based on what was said in the context of this particular warrant execution, the court is confident that the defendant should have understood this statement in the sense that it was intended. Accordingly, the court finds that the defendant was not in custody during the interview and Miranda warnings were therefore not required.

The defendant also challenges the voluntariness of his statements, arguing that he was unable to give voluntary statements based on the surprise and stress associated with the execution of the search warrant at his residence. In evaluating the voluntariness of a confession or inculpatory statements, the court is to examine the totality of the circumstances to determine whether "pressures exerted by the authorities overwhelmed the defendant's will." Martin, 369 F.3d at 1055 (citing United States v. Rodriguez-Hernandez, 353 F.3d 632, 636 (8th Cir. 2003). "Obviously, interrogation of a suspect will involve some pressure because its purpose is to elicit a confession." Id. (citing United States v. Astello, 241 F.3d 965, 967 (8th Cir. 2001)). Factors such as a "raised voice, deception, or a sympathetic attitude on the part of the interrogator will not render a confession involuntary unless the overall impact of the interrogation caused the defendant's

---

[5] See e.g. United States v. Carter, 884 F.2d 368, 372 (8th Cir. 1989).

will to be overborne." Id. (citing Astello, 241 F.3d at 967) (quoting Jenner v. Smith, 982 F.2d 329, 334 (8th Cir. 1993)). "Rather, the coercive conduct must be 'such that the defendant's will was overborne and his capacity for self-determination critically impaired." Id. (citing United States v. Santos-Garcia, 313 F.3d 1073, 1079 (8th Cir. 2002) (quoting Astello, 241 F.3d at 967)). Again, considering the totality of the circumstances, the court finds that the defendant's statements were voluntary. There is no evidence whatsoever of coercion on the part of the agents during the course of the defendant's interview. There has been no evidence presented that the defendant was so mentally impaired due to the shock of the search warrant execution that he did not understand that he was being interviewed by law enforcement, the questions that he was being asked, or the responses that he was giving. Accordingly, the court finds that the defendant's will was not overborne by the interviewing agents and his statements were therefore voluntary.

For the reasons discussed above, **IT IS RECOMMENDED**, unless any party files objections[6] to the Report and Recommendation within ten (10) days of the date of the report and recommendation, that the defendant's motion to suppress be denied.

November 1, 2005.

_____
JOHN A. JARVEY
Magistrate Judge
UNITED STATES DISTRICT COURT

---

[6]Any party who objects to this report and recommendation must serve and file specific, written objections within ten (10) court days from this date. A party objecting to the report and recommendation must arrange promptly for a transcription of all portions of the record the district court judge will need to rule on the objections.

8